UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DARRYL SCOTT,                    )
                                 )
            Petitioner,          )    CIVIL ACTION NO.
                                 )    13-10306-DPW
                                 )
        v.                       )
                                 )
BRUCE GELB,                      )
                                 )
            Respondent.          )

MEMORANDUM AND ORDER
July 28, 2014

In this petition for a writ of habeas corpus, Darryl Scott, a state prisoner convicted of first degree murder and related offenses claims his trial was conducted in violation of federal constitutional guarantees.  Finding that the state court convictions did not involve a decision contrary to, or an unreasonable application of, clearly established federal law, and did not result from an unreasonable determination of the facts, I will deny the petition.

**I. BACKGROUND**

*A.   Facts*

Factual determinations made by state courts are presumed correct absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); *Miller–El* v. *Cockrell*, 537 U.S. 322, 340 (2003).  This presumption applies not only to any findings made by the trial court, but also to those recited by a state

appellate court. *Rashad* v. *Walsh*, 300 F.3d 27, 35 (1st Cir. 2002). I set forth the testimony and evidence at trial in the light most favorable to the Commonwealth.

*1. The Killing*

The petitioner first encountered his alleged victim, Nabil Essaid, on December 1, 2002. On that occasion, Mr. Essaid and two of his friends, Ahmed Obbada and Mohemmed Ledoui, were engaged in a confrontation (allegedly drug-related) with Andrew and Andre Kornegay. Seeing the confrontation escalating, the petitioner intervened.

Mr. Obbada was the Commonwealth's key witness to the events surrounding the shooting which occurred two weeks later on December 14. On that day, as the petitioner was exiting the movie theater on Tremont street in downtown Boston with his then girlfriend Victoria Fernandes, he again encountered Mr. Essaid, Mr. Obbada, and Mr. Lebdoui. At that point, the defendant told Ms. Fernandes to keep walking, which she did, and told the three men to "[g]et the fuck out of here." The three men then began walking up Tremont Street. The petitioner followed, giving "the impression of someone who is looking for a fight." When he was eight to ten feet from the three other men, the petitioner pulled out a nine millimeter Glock pistol and fired, first at Mr. Obbada, who hid behind a car and was hit in the shoe, next at Mr.

Lebdoui, who fled, and, lastly, at Mr. Essaid, who was hit by two bullets and fell to the ground.

The petitioner then ran up Tremont Street towards the Park Street station, pausing only to retrieve a Red Sox baseball cap which flew off his head.

Ms. Fernandes also testified at trial.  She stated that as she and the petitioner left the theater, they saw three men of Middle Eastern descent leaning against a wall.  The men said, "What up?" as though they knew the petitioner and were looking to start "trouble" and then followed close behind the couple as they walked towards the Park Street subway station.  At some point, the petitioner told Ms. Fernandes to keep walking, which she did. She next heard three gunshots and saw the defendant run past her toward the subway station.  Ms. Fernandes boarded the train at Park Street. A few stops later, the defendant joined her in the subway car, and they then returned to his apartment.

Mr. Scott testified in his own defense.  He said that as he and Ms. Fernandes left the theater he saw Mr. Essaid, Mr. Obbada, and another man whom he did not recognize standing on a corner. Mr. Essaid confronted him in a threatening manner regarding the earlier encounter with the Kornegays.  As the men followed him up Tremont Street, Mr. Scott became concerned and told Mr. Fernandes to keep walking.  When he turned, the other men surrounded him at a distance of about five feet.  As the other men approached, and

fearing that they were reaching for weapons themselves, Mr. Scott pulled a pistol from his waistband. As the men closed on him, Mr. Scott fired a warning shot and then squeezed the trigger as he turned and ran. He did not know at the time how many shots he fired and only found out the next day, through news reports, that someone had been killed. He claimed that he fired out of concern that the three men were attacking him or would harm Ms. Fernandes. He then fled to the subway where he met Ms. Fernandes before returning home.

    2.   *The Petitioner's Apprehension With The Murder Weapon*

There were no leads in the shooting until nearly two months later on February 6, 2003, when the defendant and two others (one was Andre Kornegay) were observed by undercover Boston police officers standing in front of a restaurant, looking up and down the street. Mr. Kornegay and the other man walked a slight distance away from the restaurant and apparently engaged in a drug transaction. The surveillance officers were directed to arrest Mr. Kornegay and to obtain identification from the defendant. When officers approached the defendant, he ran (narrowly avoiding being hit by a passing automobile) and officers gave chase.

Several groups of officers from different divisions of the Boston police department were ultimately involved in the chase. Officer Thomas Rose testified that he became involved in the

chase and attempted to tackle the defendant, but the defendant evaded him and Officer Rose fell.  While Officer Rose was on the ground, the defendant pulled out his gun and pointed it at Rose, and then turned and pointed it at Officer Matthew Clark, who had also joined in the chase.  Officer Clark pulled out his own firearm and ordered the defendant to drop his weapon; the defendant instead turned and ran.

At some point another officer, Steven Sweeney, saw the defendant trying to climb over a stockade fence.  When the defendant saw the officer, he turned, fired a shot from his pistol (hitting nothing) and then hid himself under a tarp at which point he was temporarily lost from the officer's sight.

In the ensuing search, Officer Richard Kelley noticed a baseball cap on the ground near the tarp and made a comment to the effect that Mr. Scott has "gotta be somewhere, his hat is right there."  The petitioner, hearing the comment, emerged from beneath the tarp, pressing a gun to his head and yelling, "shoot me, shoot me, shoot me, kill me, kill me, kill me."

As officers surrounded the defendant with weapons drawn, the defendant said that he could not go to jail for a long time and that he would kill himself instead. At one point, the defendant was shouting, "kill me, shoot me, I can't go to jail." Lieutenant Detective Stephen Meade, commander of the Boston police drug control unit and one of the officers who had been conducting the

drug surveillance, testified that the defendant, who was very agitated and upset, said "I'm not going to prison, I don't want to go to jail, I'm going to kill myself."

Special operations officers were called to the scene. The defendant continued to point the gun at his head, crying and talking on a cellular telephone, saying that he could not serve a long time in jail.  To defuse the situation, police told him his sentence would not be longer than one year, because it was only a gun possession charge.

Officer Martin O'Malley said that it was only a gun charge and the defendant had a good chance of "beating it."  Officer Kelley said "You're not going to do any time in jail" and "How many of your friends do you know that have gone to jail for illegal possession of a handgun? None." The defendant replied, "none," but then added, "it's been used before."

After a stand-off between Mr. Scott and officers, Mr. Scott's father (with whom the petitioner had been talking via cell phone) arrived on the scene at which point Mr. Scott dropped his gun and was taken into custody.

A receipt for the purchase of the Glock from a pawn shop in Arizona was retrieved from the defendant during the booking process; the spent cartridge from the round that the defendant had fired near the fence was also recovered. Ballistics investigation showed that spent cartridge casings recovered from

the area where Mr. Essaid was shot matched the defendant's Glock and were fired from the same weapon.

**B.    *Mr. Scott's Trial***

On April 13, 2003, Mr. Scott was indicted by a grand jury on thirteen counts: four counts of assault with a dangerous weapon; one court of murder; three counts of armed assault with intent to murder; two counts of unlawful possession of a firearm; two counts of unlawful possession of ammunition; and one count of resisting arrest.

Before a jury was empaneled, the prosecution voluntarily dismissed one of the counts of assault with a dangerous weapon. At the close of the Commonwealth's evidence at trial, upon motion by the defense, the Superior Court judge dismissed one count of assault with intent to murder and the count of resisting arrest.

Following the presentation of evidence by both sides and a period of deliberation, the jury found Mr. Scott guilty of first degree murder, two counts of unlawful possession of a firearm, two counts of unlawful possession of ammunition, and one count of assault with a dangerous weapon.  With respect to the two remaining counts of armed assault with intent to murder, the jury found Mr. Scott guilty of the lesser included offense of armed assault with intent to kill.  With respect to the two remaining counts of assault with a dangerous weapon, the jury found Mr. Scott not guilty.

On April 27, 2006, the Superior Court judge sentenced Mr. Scott to life imprisonment on his conviction for murder, along with both concurrent and consecutive sentences for his convictions on the remaining charges.

## C.    Post-Trial Proceedings

Mr. Scott filed a timely notice of appeal of his convictions on May 4, 2006.  He also filed a motion for a new trial in the Superior Court.  The Superior Court denied the request for a new trial.  Mr. Scott appealed that decision as well, and the appeal regarding the new trial was consolidated with Mr. Scott's direct appeal to the Massachusetts Supreme Judicial Court.

On October 22, 2012, the Supreme Judicial Court upheld Mr. Scott's conviction and affirmed the denial of his motion for a new trial.  *Com.* v. *Scott*, 977 N.E.2d 490 (Mass. 2012).  Mr. Scott filed a petition for rehearing of his claims with the Supreme Judicial Court on November 5, 2012, which was denied on November 28, 2012.

Having exhausted his state direct appeal remedies, Mr. Scott filed this petition on February 15, 2013.  The Commonwealth filed a motion to dismiss the petition on October 25, 2013.  On November 14, 2013, Mr. Scott moved to amend his petition by dropping one of the grounds for his request for habeas relief.[1]

---

[1] The petitioner's fifth asserted (and now dropped) ground for relief was based upon his request to the Massachusetts Supreme Judicial Court that it exercise its supervisory powers under Massachusetts General Laws, Chapter 278, § 33E.  As the

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, a federal court may grant a state prisoner habeas relief if the state court's decision on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1).

"[C]learly established federal law" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams* v. *Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413. An "unreasonable application of" clearly established federal law occurs "if the state court identifies the correct governing legal principle from

_____

petitioner now correctly recognizes, this is a claim based wholly upon state law which is not cognizable as a claim for federal habeas relief.

[the Supreme] Court's cases but unreasonably applies it to the facts of the . . . prisoner's case." *Id.* at 407.  An application of clearly established federal law is unreasonable under this standard only if it is "objectively unreasonable," not merely if it is incorrect. *Id.* at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Renico* v. *Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams*, 529 U.S. at 411).  Rather, "that application must be objectively unreasonable. This distinction creates a substantially higher threshold for obtaining relief than de novo review." *Id.* (internal citations omitted).  Under First Circuit precedent, "if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *L'Abbe* v. *Di Paolo*, 311 F.3d 93, 98 (1st Cir. 2002) (citation and quotation marks omitted).

### III. DISCUSSION

Mr. Scott presses four separate grounds as the basis for his entitlement to habeas relief.  First, he contends that the Commonwealth's prosecutor engaged in misconduct during closing arguments by describing Mr. Scott's statements upon arrest as "confessions" and making personal attacks on defense counsel, and by eliciting prejudicial information about Mr. Scott's juvenile record during his cross-examination.  Second, Mr. Scott contends

that the trial judge committed error by allowing the prosecutor's peremptory challenge of an African-American juror after the prosecutor had challenged previous jurors of color.  Third, Mr. Scott contends that he was deprived of effective assistance of counsel by virtue of his attorney's failure to move to suppress certain statements made to police and by the failure to seek a mistrial after information about Mr. Scott's juvenile record was revealed during cross-examination.  Fourth, Mr. Scott contends the trial judge committed error by refusing to give the jury an instruction regarding the defense of another.

## A.    *Prosecutorial Misconduct*

Mr. Scott contends that the Commonwealth engaged in two separate instances of prosecutorial misconduct which so infected his proceeding with unfairness as to require habeas relief setting aside his conviction.

### 1.    *The Commonwealth's Closing Argument*

During closing argument, the Commonwealth's prosecutor described Mr. Scott's counsel as a "Monday Morning Quarterback" and told the jury that "it is easy to sit in a law office and pore over hundreds of pages of documents, police reports, witness statements, crime lab reports, ballistics reports, and poke holes, look for inconsistencies, which you know are going to be there, to second guess and criticize."  The prosecutor continued: "[Mr. Scott's counsel], for all his yelling, for all the volume he brings to the argument, has no special knowledge here.  He

knows no more about how to run a homicide investigation than you do."

Later in the closing argument, the prosecutor discussed testimony from a police officer who told the jury that at the time of Mr. Scott's arrest, Mr. Scott said "My life is over. My life is over. You don't understand." The prosecutor characterized these statements as tantamount to a confession by Mr. Scott: "I suggest to you, ladies and gentlemen, that is as good as a confession of guilt . . . His life was over because he knew he had been caught, he knew he had been cornered."

Finally, the prosecutor discussed the Commonwealth's burden of proof, stating "It is a heavy burden of proof, a monumental burden of proof. But it is the same burden of proof in every criminal case. It is a burden of proof that I will gladly shoulder with evidence like this."

The Supreme Judicial Court addressed each of these statements in its opinion affirming Mr. Scott's conviction.

First, with respect to the prosecutor's characterization of Mr. Scott's statements as a confession, the Supreme Judicial Court rejected Mr. Scott's contention that "this argument was impermissible and not a fair inference from the record . . . the jury could reasonably infer from the evidence that the defendant made the statements because he knew that the Glock in his hand was the one used in the shooting of Essaid, and that police would inevitably discover the connection." *Scott*, 977 N.E.2d at 501.

-12-

With respect to the statements about defense counsel, the Supreme Judicial Court found that "the prosecutor's personal comments about defense counsel went beyond the bounds of proper argument . . . [However,] the comments were focused on the defendant's counsel and not on the character of the defendant or the evidence confronting him, and would have had little, if any, effect on the jury." *Id.*

With respect to the statements about the burden of proof, the court said that "the prosecutor's comment . . . was made at the end of a lengthy and accurate discussion on the heavy burden of proof that the Commonwealth was required to meet. In that context, and given the testimony from an eyewitness to the shooting who was only a few feet away, plus the testimony of a number of police officers as to the defendant's actions on the evening of February 6, 2003, the prosecutor's suggestion that the evidence was strong is well supported." *Id.* at 575.

In evaluating a claim for prosecutorial misconduct, the relevant question "is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden* v. *Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 643 (1974)). "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642).

-13-

The approach taken by the Supreme Judicial Court is in substance that required by the United States Supreme Court. In *Donnelly*, the Supreme Court evaluated the entire trial record to determine if the proceeding was so "fundamentally unfair as to deny [the petitioner] due process" and considered "the seriousness of the improper remark, the context in which the statement was made, the court's response or curative instructions, and the effect of the statement on the overall proceeding." *Dagley* v. *Russo*, 540 F.3d 8, 17 (1st Cir. 2008) (discussing *Donnelly*, 416 U.S. at 644-47). The Supreme Judicial Court did the same here, weighing the seriousness of the remarks by the prosecutor within the context of the entire proceeding and recognizing the curative statement by the trial court, who instructed the jury: "[L]et me remind you that what counsel have said in their closing arguments is not evidence. It is their view of the evidence and each of you must make your own independent judgment about what you believe the evidence proves or does not prove . . . [C]ounsel's role here is to try the case, not to give opinions and not to interject themselves into the process, so if you think anyone has done that or feel anyone has done that, disregard that altogether."

As the Supreme Court has recognized, a trial may be imperfect, but that does not make it "fundamentally unfair." *Darden*, 477 U.S. at 183. Although some portion of the prosecutor's closing statement may have been beyond the bounds of

-14-

proper argument, those comments were only a small part of a larger trial. Moreover, the comments were followed by clear instructions by the judge to the jury directing them to disregard any personal opinions interjected by either counsel. The decision to reject Mr. Scott's argument that the prosecutor's comments during his closing argument rendered his trial "fundamentally unfair" was not contrary to clearly established federal law.

> 2. *The Prosecutor's Questions about Mr. Scott's Juvenile Record*

During his direct examination, Mr. Scott testified about acquiring the firearm ultimately used in the shooting. As he explained, he purchased the gun while living in Arizona in 2002. In response to a question from his own counsel regarding how he acquired the weapon, he testified that: "[He] filled out a form indicating, . . . that [he] didn't have any criminal background, and [he] showed [the seller] [his] driver's license."

The prosecution sought to challenge this testimony by asking about Mr. Scott's juvenile record. The Commonwealth's prosecutor and Mr. Scott had the following colloquy:

Q:   You had a prior case in Juvenile Court, sir . . . Is that right?

A:   Yes, sir.

Q:   And you were found guilty?

A:   No, I was not.

Q:   You were not found guilty?

A:    No, sir, I was not.

Q:    Found delinquent?

A:    No, sir, I was given probation.

Q:    You were given probation?

A:    Yes.  And if I completed my probation that I would not have
      been charged with the incident.

...

Q:    You didn't indicate that on the form, did you?

A:    No, because it says felony.  That's a federal form.  If I
      was charged I would not have received the firearm, sir.

Q:    You received probation?

A:    Yes, I did.

Defense counsel objected to this line of testimony.  During
a sidebar discussion, the trial court learned that the prosecutor
had not obtained a record of Mr. Scott's juvenile adjudication
and decided that it would strike the testimony related to Mr.
Scott's juvenile record.  The trial judge instructed the jury
accordingly: "Ladies and gentlemen, the question and answer
regarding something that happened in Juvenile Court is stricken
from the record and you're not to consider it at all."

The improper statements regarding Mr. Scott's juvenile court
proceeding do not warrant habeas relief for two reasons.  First,
after the statements were elicited by the prosecution, the judge
promptly issued a curative instruction.  A "'crucial assumption'
underlying the system of trial by jury 'is that juries will
follow the instructions given them by the trial judge.'"

*Marshall* v. *Lonberger*, 459 U.S. 422, 438 n. 6 (1983) (quoting
*Parker* v. *Randolph*, 442 U.S. 62, 73 (1979), *abrogated in part*
*Cruz* v. *New York*, 481 U.S. 186, 191 (1987)).  While there may
circumstances in which "the risk that the jury will not, or
cannot, follow instructions is so great" that such instructions
will be insufficient to preserve due process, *Gray* v. *Maryland*,
523 U.S. 185, 190 (1998) (quoting *Bruton* v. *United States*, 391
U.S. 123, 136 (1968)), there is no reason to believe that this is
such a circumstance; the inappropriate testimony was brief and
the instruction was given clearly and promptly.

Second, even if no curative instruction had been given, this
testimony did not reach the level of a violation of clearly
established Federal law, as determined by the Supreme Court of
the United States.  The Supreme Court has expressly declined to
determine "whether a state law would violate the Due Process
Clause if it permitted the use of 'prior crimes' evidence to show
propensity to commit a charged crime." *Estelle* v. *McGuire*, 502
U.S. 62, 75 n. 5 (1991).  Absent such an express determination,
"the broader fair-trial principle is the beacon by which we must
steer." *Confingford* v. *Rhode Island*, 640 F.3d 478, 485 (1st Cir.
2011).  The stricken testimony was only a brief colloquy, which
did not describe the underlying juvenile offense or give any
indication of its seriousness.  Rather, the testimony was only
that Mr. Scott had been involved in a minor offense as a juvenile
and had been placed on probation, after which he was deemed

legally permitted to purchase a firearm.  As the Supreme Judicial
Court recognized, such a fact "would have had but little impact
on the jury."  *Scott*, 977 N.E.2d at 501.  *See also Crouse* v.
*Dickhaut*, 2013 WL 1054845, at *13 (D. Mass. March 13, 2013)
(citations omitted) ("Vague references, with no elaboration
regarding the specific crime or surrounding circumstances, to a
petitioner's prior time in prison have been held not to
constitute a violation of due process.").

**B.    *Peremptory Challenge of African-American Jurors.***

Mr. Scott contends that the Commonwealth exercised its
peremptory challenges in a racially discriminatory manner that
violated the Fourteenth Amendment, and that the state court
decisions upholding his conviction in light of this violation
represent an "unreasonable application" of Supreme Court
precedent under 28 U.S.C. § 2254(d).

As the Supreme Court has explained, "[t]he Constitution
forbids striking [from the jury] even a single prospective juror
for a discriminatory purpose."  *Snyder* v. *Louisiana*, 552 U.S.
472, 478 (2008).  *Batson* v. *Kentucky*, 476 U.S. 79 (1986) sets
forth the clearly established federal law governing contentions
that the prosecution has violated a defendant's rights by
exercising peremptory juror challenges in a racially
discriminatory manner.  In *Batson*, the Supreme Court "described a
three-part test for adjudicating claims that peremptory
challenges have been exercised in a discriminatory manner.  The

moving party bears the initial burden of demonstrating a prima facie case of discrimination . . . If this burden is met, the non-moving party must then offer a non-discriminatory reason for striking the potential juror . . . Finally, the trial court must determine if the moving party has met its ultimate burden of persuasion that the peremptory challenge was exercised for a discriminatory reason." *Aspen* v. *Bissonnette*, 480 F.3d 571, 574 (1st Cir. 2007) (citing *Batson*, 476 U.S. at 96-98).

During the first day of jury selection, the prosecution sought to exercise a peremptory challenge against juror no. 5-16, an African-American male. The prosecutor indicated his reason for the challenge was that the juror had an upcoming job interview within the next week and was anticipating the birth of his child within the next month. Defense counsel objected, under *Commonwealth* v. *Soares*, 387 N.E.2d 499, cert. denied, 444 U.S. 881 (Mass. 1979), stating that the challenged juror was one of the few black males in the room. The judge rejected the challenge and sat juror no. 5-16. During the second day of jury selection, the prosecution sought to exercise a peremptory challenge as to juror no. 10-10, an African-American female. Defense counsel again objected under *Soares* stating "[t]hat was a black female, and I suggest to the Court that, I believe this is the third or fourth person of color, the fourth person of color that the Commonwealth has challenged." The Court responded: "One I didn't allow. The others, there were neutral reasons for them.

-19-

In this county they challenge everybody under twenty-five, thirty, whatever. What was your reason?" The prosecution then stated: "First, as a matter of record, the Commonwealth has, I don't know the numbers but several people of color that were not challenged. I suggest there is no pattern. I understand the Court's ruling on the gentleman yesterday as a male . . . But there are a number of women of color who were seated on the jury yesterday." The judge then allowed the challenge and the juror was excused. Finally, the prosecutor then sought to exercise a peremptory challenge against juror no. 11-10, a Hispanic female. In response to defense counsel's objection, the prosecutor responded that there was no "pattern" of discrimination and also explained that the juror was employed at a school where a man that he was prosecuting for murder had previously worked. After further questioning from the judge revealed no relationship between the prospective juror and this man, the prosecutor withdrew the challenge.

In reviewing these events, the Massachusetts Supreme Judicial Court determined that Mr. Scott had not made out a prima facie case that the prosecution was employing its peremptory challenges in a racially discriminatory manner: "By not requiring the prosecutor to provide a reason for the challenge after his initial statement that there was no pattern of discrimination, the judge plainly accepted the prosecutor's assertion, unchallenged by the defendant, that a number of African-American

women (as was juror no. 10-10) had been seated without challenge on the previous day, and that there was no pattern of discrimination, thus concluding that the defendant had not met his burden of establishing a prima facie case." *Scott*, 977 N.E.2d at 499.

The question thus is whether the Massachusetts Supreme Judicial Court's determination that a prima facie case of discrimination had not been made out was an "unreasonable application" of *Batson* and its Supreme Court progeny.

Recently, in *Sanchez* v. *Roden*, 753 F.3d 279 (1st Cir. 2014), the First Circuit explored the standard for evaluating a *Batson* challenge in a state habeas corpus proceeding. There the court observed that the only "objective difference" between a juror who was struck by the prosecutor and one who was not was race--"the government struck the black juror while allowing the white one to serve." *Id.* at 304. As the court explained, "[s]uch differential treatment, while by no means dispositive as to the ultimate question of racial discrimination, suffices at *Batson*'s first step to raise an inference of possible racial discrimination." *Id.* Additionally, the First Circuit explained that it could find no reason for this challenge or the challenge of other young black men: "We can do no more than speculate, as no reason for the challenges—at least, none that appears to have mattered to the prosecutor in light of the characteristics of other prospective jurors he did not challenge—is obvious from

this record." *Id.* at 305. Taken together, the First Circuit in *Sanchez* concluded that the "the facts and circumstances were sufficient to permit an inference that the prosecutor's challenge of [one of the jurors] may have been racially motivated." *Id.* at 307.

That is not the circumstance in this case. Here, the record does not contain any information suggesting a "differential treatment" of African-Americans by comparison with otherwise similar juror-candidates. The Massachusetts Supreme Judicial Court found that there was no pattern of discrimination discernable from the numeric evidence regarding the jurors who were seated, observing that "the defendant did not dispute the prosecutor's assertion, with which the judge apparently agreed, that at least three African-American jurors had been seated when juror no. 10-10 was challenged." *Scott*, 977 N.E.2d at 499. The Supreme Judicial Court also recounted that the trial court, before inquiring of the prosecutor about the reasons for his challenges, observed that race-neutral reasons for them existed-- suggesting that the trial court had not concluded that there was a prima facie case of discrimination.

In sum, the Massachusetts Supreme Judicial Court made the appropriate inquiry, which required that it review "all of the circumstances that bear upon the issue of racial animosity," *Snyder*, 552 U.S. at 478, focusing on "whether 'a peremptory challenge was based on race.'" *Sanchez*, 753 F.3d at 292 (quoting

-22-

*Snyder*, 552 U.S. at 476).  Having engaged in the proper inquiry,
the Supreme Judicial Court made the determination that no prima
facie case of discrimination had been made.  This factual
determination, owed deference under AEDPA, was not an
"unreasonable application" of federal law and so precludes habeas
relief on Mr. Scott's *Batson* claim.

## C.   *Ineffective Assistance of Counsel*

Mr. Scott contends that he was deprived of his
constitutional right to the effective assistance of counsel in
two ways.  First, that his counsel failed to move to suppress
statements made by Mr. Scott at the time of his arrest or to
request a jury instruction regarding voluntariness, and second,
that his counsel failed to request a mistrial after the
prosecution questioned Mr. Scott about his juvenile record.

The Supreme Court set forth the standard for a claim of
ineffective assistance of counsel in *Strickland* v. *Washington*,
466 U.S. 668, 687 (1984):

> First, the defendant must show that counsel's
> performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the defendant
> by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

To establish ineffectiveness, a "defendant must show that
counsel's representation fell below an objective standard of
reasonableness."  *Id.* at 688.  To establish prejudice he "must

-23-

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court evaluating a claim of ineffective assistance "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

    1.   *Failure to Move to Suppress Mr. Scott's Statements or Request a Jury Instruction on Voluntariness*

To assert a meritorious claim of ineffective assistance of counsel based upon a failure to file a motion to suppress evidence, the underlying motion to suppress must itself have merit. *Kimmelman* v. *Morrison*, 477 U.S. 365, 382 (1986). Because Mr. Scott cannot show this necessary predicate, his claim for habeas relief on this basis fails.

The testimony at trial was that, after being chased by police and during an armed stand-off, Mr. Scott made a series of statements, including saying: "Kill me, shoot me, I can't go to jail"; "It's over, this is over, this is it"; and, in response to statements from police that he might only spend a year in jail, "you don't understand." During its closing argument, as discussed above, the prosecution described these statements as tantamount to a confession by Mr. Scott that he had previously committed a serious crime and therefore was facing a longer

-24-

sentence than that warranted for a simple charge of possession of a firearm.

Faced with these claims, the Supreme Judicial Court made a determination that these statements were made voluntarily:

> Nothing in the record suggests that the defendant's statements were not voluntarily made, or that he was so overwrought that they were not the product of a rational intellect or made of his free will. The statements were initiated by the defendant when he jumped out from under the tarp and spontaneously started speaking, and continued almost exclusively in the absence of any questions by police . . . The defendant was not being questioned about any crime. Police were unaware that the defendant had any involvement in an earlier shooting, and asked him nothing about that crime. The questions they did ask—"How many of your friends do you know have gone to jail for illegal possession of a handgun?"—were focused only on getting the defendant to put down his weapon. Moreover, those few questions were rhetorical and answered, in one instance, by the officer who posed the question.

*Scott*, 977 N.E.2d at 504. Mr. Scott has not offered any "clear and convincing evidence" that these factual determinations are incorrect; consequently those determinations are presumed correct. 28 U.S.C. § 2254(e)(1). These factual determinations provide no suggestion either that the "defendant's will was overborne' by the circumstances surrounding the giving" of these statements, *Dickerson* v. *United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226 (1973)), or that these statements were the product of "coercive activity of the State," *Colorado* v. *Connelly*, 479 U.S. 157, 165 (1986), both of which are predicates to a successful motion to suppress. Mr.

Scott's counsel cannot be deemed ineffective for failure to file motions which the facts, as found by the Supreme Judicial Court, demonstrate to be non-meritorious. *See Acha* v. *United States*, 910 F.2d 28, 32 (1st Cir. 1990) (per curiam) ("Trial counsel is under no obligation to raise meritless claims," and "[f]ailure to do so does not constitute ineffective assistance of counsel.").

This same conclusion extends to a failure to request a jury instruction on voluntariness. Massachusetts' "humane practice" jurisprudence requires that:

> when statements amounting to a confession are offered in evidence, the question whether they were voluntary is to be decided at a preliminary hearing in the absence of the jury. If he (the judge) is satisfied that they are voluntary, they are admissible; otherwise, they should be excluded. If the judge decides that they are admissible, he should then instruct the jury not to consider the confession if, upon the whole evidence in the case, they are satisfied that it was not the voluntary act of the defendant.[2]

---

[2] The procedures under Massachusetts law differ from those required by federal law. In a trial in federal court, "[b]efore [a] confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." 18 U.S.C § 3501(a). Massachusetts law seeks to "preserve an independent role for the jury in applying select technical exclusionary rules . . . 'the judge hears the [preliminary] evidence, himself resolves evidentiary conflicts and gives his own answer to the preliminary question' . . . The jury may then . . . disagree with the judge, decline to find the preliminary facts, and ignore the proffered evidence." *Commonwealth* v. *Bright*, 974 N.E.2d 1092, 1101-02 (Mass. 2012) (quoting *Jackson* v. *Denno*, 378 U.S. 368, 378 n. 8 (1964)).

*Commonwealth* v. *Marshall*, 155 N.E.2d 798, 800 (Mass. 1959).

However, "[a] judge has 'no duty to ask the jury to pass on

voluntariness unless it is made a live issue at trial.'"

*Commonwealth* v. *Tavares*, 430 N.E.2d 1198, 1205 (Mass. 1982)

(quoting *Commonwealth* v. *Alicea*, 381 N.E.2d 144 (Mass. 1978)).

Given that the facts found by the Supreme Judicial Court

demonstrate the voluntariness of Mr. Scott's confession was not a

"live issue," failure to request this instruction does not

demonstrate that Mr. Scott's counsel was ineffective.

> 2. *Failure to Request a Mistrial After the Prosecution's*
>    *References to Mr. Scott's Juvenile Record*

Mr. Scott also argues that his counsel was incompetent for

failing to move for a mistrial after the prosecution's questions

elicited brief, but vague, references to Mr. Scott's juvenile

record.  As explained above, a petitioner asserting a claim for

ineffective assistance of counsel must show both that "counsel's

performance was deficient" and "that the deficient performance

prejudiced the defense." *Strickland*, 466 U.S. at 687.  Mr. Scott

cannot meet either prong of this test.  First, following the

references to Mr. Scott's record, his counsel promptly requested

and obtained a curative instruction from the judge.  This

demonstrates both that Mr. Scott's counsel was alert to the

relevant issue and sought immediate corrective action.  Rather

than showing deficient performance, this suggests the opposite.

Second, Mr. Scott cannot demonstrate that the failure to request

a mistrial prejudiced his defense. "Within wide margins, the prejudice caused by improper testimony can be addressed by providing appropriate curative instructions." *United States* v. *De Jesus Mateo*, 373 F.3d 70, 73 (1st Cir. 2004). Such an appropriate curative instruction was given here. Moreover, again as discussed above, the references to Mr. Scott's juvenile record, within the context of the trial, were so vague, brief and immaterial that they were unlikely to affect the jury's decision--even if uncured. Given this, Mr. Scott cannot demonstrate prejudice from his counsel's failure to seek a mistrial.

**D.** **Failure of the Trial Judge to Provide a Jury Instruction Regarding Defense of Another**

Mr. Scott contends that the trial judge's failure to instruct the jury on defense of another violated the due process guarantee of the Fourteenth Amendment.

Under Massachusetts law, an individual is entitled to use force to protect a third person if "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself." *Commonwealth* v. *Young*, 959 N.E.2d 943, 952 (Mass. 2012) (quoting *Commonwealth* v. *Martin*, 341 N.E.2d 885, 891 (Mass. 1976)).

The Supreme Judicial Court upheld the trial court's determination that an instruction regarding the defense of another was not warranted based upon the evidence adduced at trial.  As the Supreme Judicial Court explained, by the time Mr. Scott engaged in the deadly shooting, his companion "had walked on, as he told her to do, the defendant could no longer see her, and he did not know where she had gone. Viewing the evidence in the light most favorable to the defendant, the three men were focused on, and surrounding, the defendant . . . The men were not following or threatening Fernandes, who would not have been entitled to use deadly force in her own defense." *Scott*, 97 N.E.2d at 503.  Mr. Scott has not set forth any facts demonstrating that the Supreme Judicial Court's conclusion was improper.

More importantly, under 28 U.S.C. § 2254, habeas relief is available only for violations of "clearly established *federal* law."  Improper instructions regarding state law "cannot, without more, provide grounds for federal habeas corpus relief." *Rosado* v. *Allen*, 482 F. Supp. 2d 94, 114 (D. Mass. 2007).  *See also Niziolek* v. *Ashe*, 694 F.2d 282, 290 (1st Cir. 1982) ("Instructions in a state trial are a matter of state law to which substantial deference is owed," and, thus, "[a]s a general rule, improper jury instructions will not form the basis for federal habeas corpus relief.").  Habeas relief will be granted only where "'the ailing instruction by itself so infected the

entire trial that the resulting conviction violates due process.'" *Estelle,* 502 U.S. at 72 (quoting *Cupp* v. *Naughten*, 414 U.S. 141, 147 (1973)).  Based upon the factual record which demonstrates no need under Massachusetts law for an instruction regarding defense of another, I find no error in the trial court's refusal to provide that instruction to the jury and that this refusal does not constitute a violation of Mr. Scott's federal due process constitutional rights.

## IV. CONCLUSION

For all the reasons set forth above, I hereby order that this petition for habeas corpus relief be DENIED and direct the clerk to dismiss the petition.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE